This case surrounds the interpretation and application of a claims-made insurance policy covering claims of legal malpractice. I represent Gwinnett & Leighton, who are here asking this plaintiff, Wesco Insurance Company, holding that the policy did not cover their claims against the insured Ledford White. The reason we're asking the court reverse it is twofold. First, there is a question of fact as to whether Mr. White first received notice of the Leighton's malpractice claim during the policy period. And secondly, there's also a question of fact, we believe, whether Mr. White knew or should have known of that malpractice claim when he purchased the policy. Well, we have a suit that was filed before the policy went into effect, don't we? That's exactly right, Your Honor. Why isn't that just on its face or not? That is exactly what Judge Amin said, and broadly respectably, he was incorrect. The reason I believe he was incorrect is that the lawsuit that was filed in August of 2013, approximately eight months before the policy was purchased by Mr. White, it alleged various claims of intent such as theft and fraud. It did not include a claim for breach of fiduciary duty. It did include a claim for breach of fiduciary duty. If you read the petition in full, the parties, Mr. White and Mr. Leighton, had a 20 to 30-year relationship. Not only had Mr. White previously represented Mr. Leighton in various legal matters, but they were also friends. They socialized, they traveled together, they constantly saw each other. The evidence actually showed that they were very close. The reason that we would be remiss in not recounting the fact that Mr. White had acted at his lawyer from time to time as part of showing a background to show the traditional basis for fiduciary duty, which is a reason to oppose faith and trust in someone else. With respect to actually asking for a fiduciary duty to be imposed in the original petition based upon a lawyer-client relationship, even Wesco acknowledged that nothing in the original petition was a claim under the policy. You only said that about 12 times in your brief. Forgive me, Your Honor. When you get a point, I guess I make it as often as I can. But how does that, I mean, just looking at it, I'm sure you know the paragraphs by number. He, breach of fiduciary duty, 39. White owed fiduciary duties to the Leightons. Next sentence. White is a board-certified commercial real estate attorney who has served as the Leightons' attorney, advisor, and confidant. Yes, Your Honor. That and just the earlier paragraphs again and again, he is the real estate attorney and not only his friend, but also his professional responsibilities. Isn't that the essence of what came, is the lawsuit? How does that make sense? That is the essence of the lawsuit that was ultimately charged. Yeah. The lawsuit was amended in, after the law, after the policy was purchased in May of 2014, where we did add claims of legal malpractice, as well as a breach of fiduciary duty. But if they're not just lurking, they're explicit. Isn't the standard that does it rise out of, hence it's not a new cause of action, it's factually the same, the law is pretty clear at that point. I'm just thinking on the fortuity doctrine. With all due respect, Your Honor, the reason I disagree is because, one, first of all, there's evidence in the record that WESCO, when we deposed its representative, as again I've said before, they acknowledge that no legal claim had been pled. But I was wondering that, why would we look at subsequent parole evidence? Isn't it just the eight corners to decide this? With the claims of a duty to defend, I believe the eight-corner rule applies. With respect to duty of indemnity, I do not believe that's exactly right. In fact, Judge Means, early on in his opinion, he talked about how with duty to defend, you do look at the eight corners, but with respect to duty to indemnify, you can look beyond that. And this is a duty to indemnify, not duty to defend. And so with respect to whether or not, and jumping to the fortuity doctrine, the reason I believe that that does not give rise to a defense in this matter, or at least that there's a question of fact, and let me be clear, this was a summary judgment. I'm not here going to, you're not going to hear me say there's absolutely no evidence that White knew he should have known. What you hear me say is at least there's some evidence that he maybe should not have known or may not have known. What's the evidence against it? You say it's because White said he didn't, he didn't think it was a claim? Not just because of that, but there's also in the record a testimony that before, after the policy was purchased, but before the petition was amended, West Coast representative, Mr. Albert McLaughlin, had a telephone call with Mr. White where they discussed the original petition. And in that telephone call, according to Mr. McLaughlin's testimony, they discussed the background, they talked about the petition and the history between Mr. Layton and Mr. White. And McLaughlin's testimony was, it is also reflected in his notes, that Mr. White told him this was not arising out of a legal relationship, this was out of a friendship, and that Mr. McLaughlin agreed and said, I don't believe this meets the claims made trigger. You have it, Mr. McLaughlin. Was Mr. McLaughlin a 20-year-long friend of White also? No, sadly not. Sadly, yes. Well, for us, sadly not. What's the best case in the fortuity doctrine that establishes the relevancy enter? Is it knowledge of the acts or knowledge by the insurer that the acts cause liability? You say the latter, right? I believe the latter. And what's the best case? I believe the best case for that, which actually is going to sound odd because it rules in the opposite way, is the warrant tech matter. Warrant tech goes into a great discussion about the fortuity doctrine. The reason I don't think warrant tech is different here is because the facts are different. In that case, which is from the Fort Worth Court of Appeals, my hometown, it ruled that warrant tech actually knew or should have known a claim was going to be made because it had participated in an arbitration. And in that arbitration, it talks about how it had been a witness between two different parties, and the parties who were arguing about, well, whether or not warrant tech had negligently or intentionally failed to provide its services under a warranty contract. Although warrant tech was not a party to it, it was there and present and heard all the allegations according to court about it being negligent or intentionally remiss in its program. Because it was present and heard those before it purchased the policy, then the court ruled, well, the fortuity doctrine applies because they were on notice. Here, with respect to the negligence claim, and again, I know there's hesitancy because of the fiduciary duty claim in the original petition, but based upon Mr. McLaughlin's telephone call and his testimony in the record that we've talked about, the only evidence that would apply that Mr. Byte knew anything was what was in the original petition, the original petition just simply being theft and fraud. Now, Judge Means, in his order, said, well, the fact that there was theft and fraud should also go to show that the fortuity doctrine applies. How wouldn't it — well, how wouldn't he have knowledge if he submitted that original petition to WESCO? Right? Forgive me. How would Mr. White? I may be wrong in my assumption, but I thought White gave the original petition to WESCO. Wouldn't that suggest he knows there's going to be a claim? I believe this is in his deposition testimony. Okay. Forgive me. Being counsel of the record maybe makes it difficult to parse out what is — and the record in this was massive with respect to the summary judgment. But I believe in Mr. McLaughlin's testimony, it was talked about how the petition was filed in August of 2013. He purchased the policy in March of 2014. I think March 14th was the effective date. In May, two months later, they had a discussion about the original petition. The reason that they had that discussion is because the broker for Mr. White, as I recall, his insurance broker, told Mr. White, you know, you ought to give this to WESCO. I believe that's the reason that that happened. Yeah, but when he filed the policy application, he said there was nothing pending, right? He said that there was no claim pending. That's right. As Mr. McLaughlin testified, and I don't believe that — well, let me just answer the question. With respect to what Mr. McLaughlin testified, he said that claim has to be, to his understanding, and this is in his deposition of the record, claim has to be defined as it is in the policy, the same as it is in the application. And so when Mr. McLaughlin is saying the original petition showed no claim, we contend that the answer by Mr. White was exactly correct because if WESCO is going to say the original petition does not state a claim, then if claim is defined the same in the policy, then that was the proper answer. I assume that when the Laytons got counsel, they could afford good counsel, and I would assume that whenever they filed their first petition, they must have thought they were going after either White's assets, like that oil well that he hid from them, or else a very sizable personal liability policy. But then they figured out, oops, maybe we need to bring in the professional liability insurer too, which is what — or else they discovered it during discovery that maybe he didn't have a personal liability policy, and now we're going to make sure we get the professional policy. If I may, let me throw a third option at you. Mm-hmm. The third option is simply this. The third option is maybe counsel is always remiss. You're going to have to talk up a little. Oh, forgive me. That counsel may be a little bit remiss in bringing a negligent malpractice claim because it's always, you know, live by the sword, die by the sword. And not wanting to take — given the facts as they were, that they did have this long relationship, that there was no written counsel agreement with respect to this transaction, given the fact that Mr. White was acting as an intermediary between two folks, making that allegation that he — Are you talking about the oil investment or the floor plan? Both. Both were actually the same thing. Mr. Parks, with respect to the floor plan and the land investment, and Mr. Isbell, he was standing in the middle between the lanes on the one hand and those parties on the other. Candidly, we found out later, he represented both previously in his career. But not — wanting not to accuse someone of legal malpractice until you're certain that you are right, that they either did or should have represented someone as a lawyer, and engaged in discovery that would satisfy you that that was, in fact, the case. Well, Leighton went to this guy to handle a real estate transaction and also to, I assume, prepare some kind of instruments on the floor plan. Why wouldn't he anticipate a professional liability claim to come out of that? Well, let me go back. The facts are not that Leighton went to Mr. White about this. It's the exact opposite. Mr. White, whose clients, Mr. Parks and Mr. Isbell, one who had the land issue and the other one the cars, went to Leighton and said, I've got these other folks who have investments. Would you like to invest? Yeah, well, the way it all came — the way it all got discovered, I believe, was Mr. Parks. Leighton wasn't getting his money anymore out of the floor plan, and at some point White said, and Leighton called up Parks, and Parks said, What? I've been paying like all the time. You're exactly right, and that is when the house of cards began to fall down. At that point, we knew that there was money that was not being paid back and that there was a lawsuit based on something, which was why he was initially sued for theft and fraud. But circling back to the point I was trying to make a moment ago, because I think this underscores it, yes, we did allege in the petition that there was a fiduciary duty. Yes, we did talk about the fact that Mr. White had been his attorney in the past. But that was part of the penumbra, as the case was originally presented, that, yes, he acted as counsel. Yes, he was an advisor. They were friends. They socialized. They traveled together. They went on cruises together. Initially, as part of the overall issue that, yes, they're not only just friends, they're confidants and advisors for each other, which gives rise to the traditional notion of a fiduciary duty. With respect to ‑‑ I do want to point out one other issue, if I may, with respect to Judge Means's order, particularly with respect to the notice requirement. The way that Judge Means ruled, and I have known Judge Means for years and respect him immensely, but in his opinion, this is how he concluded it with respect to the notice issue. The factual allegations contained in Layton's original petition potentially assert a claim for coverage. I believe that, in all due respect, is error. If it potentially asserted a claim for coverage, well, here the issue is, did it assert a claim for coverage? And as movements, Wesco's burden was, which Judge Means had to find, that they, as a matter of law established, that notice was provided. If it was essentially there was a potential it could have asserted notice, given notice, back in August of 2013, in all due respect, that isn't enough to meet the summary judgment standard. In fact, if it was just potential, that also seems to violate the notion, well, two notions. One, all inferences must be read in favor of the non‑movement. And two, the policy that when there is a question as to whether or not there is coverage under an insurance policy, then all inferences should be that there is coverage. And so, with all due respect, I do think Judge Means' ruling does havoc with that because he says it was the potential, not the actuality. Of course, the fortuity doctrine covers a loss that's in progress, too, which I think is probably what Judge Means was thinking about. If that ruling was in the fortuity doctrine section of his opinion, I would agree, but it was in the notice section. He addressed fortuity separately later in the opinion. Thank you, Your Honors. Okay. We have time for rebuttal. Mr. Krantz. Good afternoon, and may it please the Court. I first wanted to address Judge Higginson's question on the eight corners rule, essentially, and the question of parole evidence. We address Mr. McLaughlin's testimony in our brief, and it was addressed in detail in the summary judgment briefing, and we believe there's no problem with Mr. McLaughlin's testimony. He was addressing hypothetical situations, and he was addressing what would happen if the legal services definition wasn't satisfied. Would there be a timing issue versus the opposite so that we don't think there's any relevance? That's in the deposition. In Mr. McLaughlin's deposition. But more importantly and more fundamentally to respond to Judge Higginson's question, I believe opposing counsel was correct in part when he said that this is a duty-to-indemnify case rather than a duty-to-defend case. But the rest of what opposing counsel said I disagree with. This is a contract interpretation case, and so there is an interpretation of the insurance policy. Only if there's a finding of ambiguity, which there has not been in this case, would there be an opportunity to argue that parole evidence was admissible, and then we could argue about what the import of what Mr. McLaughlin said. But there was no finding of ambiguity in the relevant policy language, so that is applicable to the duty-to-indemnify, which is determined by the actual facts. And what's the strongest statement of the test in order to determine between a lawsuit that then is amended and adjusted? What's the test that assesses whether it's a new cause of action or not? Right, and that would go to one of the two grounds that Judge Means ruled on, and we have additional. The best argument is that, and I think the Laytons really say two things. They say a new claim was added in the amended petition and a new party was added, white PC. And I think that in both of those they fall short. White and white PC are essentially 100% overlapping. All of the cases in the Laytons two briefs deal with situations. They have a few cases where the court found it was, in most cases the court nonetheless found it was still one claim and it was not a, quote, new claim. The case actually from the Seventh Circuit applying Illinois law that they cite in their reply brief, Jewish Community Foundation, the court actually ruled that the newly filed complaint was actually the same for insurance coverage purposes as the original complaint. Hypothetically, in dicta, they said if a new party had been sued and they named it the Federation, then it would be a different story perhaps. That was dicta. Importantly for our purposes in that situation and in every case I'm aware of, the new party is completely unrelated and doesn't overlap with the insurance. It would be another defendant. Here we have white and white PC. He's the principal and the agent. All the evidence establishes that for all relevant coverage purposes. What white knew, white PC can only act through its agent, white, and white's knowledge is attributed to white PC. It would not make sense to say there was something that white knew but white PC didn't know. That just makes no sense both for the notice argument and for the known loss argument. It also, we have a third basis to deny coverage, which Judge Means did not need to reach. It's in our brief. It's condition 1A2 of the policy. Instead of getting to that, what's the other half of the equation in terms of the cause of action facts and allegations? The cause of action here that was added was professional negligence. The Laytons say, well, white didn't know that fiduciary duty was legal services. He didn't understand coverage. Under the law, it doesn't get any insured anywhere. It's certainly not an attorney insured is charged with understanding his policy. When the petition was amended to add professional negligence, the factual basis of white's conduct was the same. And if you look both at the amended petition, comparing it with the petition, and more importantly, as counsel recognized, this is a duty to indemnify. So let's look at the actual facts, and let's look at the underlying trial and the judgment. And if you look at the judgment on multiple causes of action, the conduct is the same. And that's the test, a rise out of same nucleus effect? Correct. I'm sorry, Your Honor, that is the test. And the best case for that is? Yes. And if you look at the judgment, the jury found for the Laytons on professional negligence and then also on all of the intentional conduct allegations like fraud, the Laytons apparently elected their remedy, and their remedy was not professional negligence. If you look at the judgment order, look at the jury verdict and then the final judgment in the underlying case, the tort case, not the coverage case, what you will see there is that the dollar amount could not be for professional negligence because it wasn't reduced by 30%. The jury found that the Laytons were 30% responsible for the negligence. That was the only opportunity the jury had to assign fault to the Laytons. And in that count, they assigned 30% to the Laytons. So if the final judgment was based on professional negligence, it would have been reduced by 30%. And it wasn't. It was 100%. And so, therefore, the actual facts show that White was found liable and a judge to have to pay a sum that wasn't professional negligence. And that undercuts the argument that, well, there's coverage because the complaint was amended to include professional negligence. But more basically, yes, the common nucleus of operative fact is set forth in the petition and the actual evidence at trial. White did a lot of things you can label. I think in our case we cite a Texas case or I think a Fifth Circuit case about labeling. The label doesn't change. Insurance coverage isn't based on the label. It's based on the actual facts when you're talking about the duty to indemnify, and that is Texas law. You have a Texas law case on the fortuity doctrine. The same question I asked opposing counsel, is the scienter the scienter of the underlying act or the scienter that the act would make a claim? Am I asking the question correctly? I think you are. We like the Warren Tech case, but it actually summarizes. It cites to a lot of cases, including there's a Texas Supreme Court case, 1970, that says there's nothing wrong with an insurance policy applying to acts or causes of action, anything that happened before the policy incepted, as long as neither the insured or the insurance company are aware. Aware of what? And they say loss, because the doctrine emerges out of first-party cases where there's been a fire or your car has been damaged. It does become more difficult. The test is, and if I can throw in here, if you read the Leighton's reply brief, they are forced to cite to out-of-state cases, including a Bar Journal article, which actually argues for a change in Texas fortuity law. So that's the Texas fortuity law that we have is the basis that Judge Means applied correctly. White knew, even if a petition hadn't been filed against White before the policy period, so there's no doubt, and Judge Means' opinion makes clear, White knew that there was a claim against him. So we don't really have to answer your question. There was a lawsuit against White prior to the WESCO policy period. So claim, loss, bad conduct, he knew all of those things. He may have disagreed with it, but he knew of it. Yes. Well, I would say he may not have thought he was going to get caught, but he knew what he was doing. He may not have thought that he was going to get caught, and he convinced the Leightons that they were going to get paid. So he may have thought, they're not going to bring a claim against me because they believe that they're going to get paid. So you might have an interpretation that says the known loss doctrine won't apply unless White thinks that he's going to get sued. But even on that, sort of the strongest version, he still knew. He still knew before the policy period because he was sued. We would argue even if he hadn't been sued, he knew in April 2013 he told the Whites, I guess you're not getting your money. All these other sources have dried up, and you're out the money. Now, any reasonable person, I think, would realize at that point. Even if he hadn't known it at that time, I mean, even if he hadn't even spoken with them, and he was just apparently getting into financial difficulties from time to time so that he had to tap them, but he still knew what he had done, and it was going to hit the fan sometime. Right, exactly. I mean, I would go farther. Yeah, that's all right. That's what I was referring to. He had guilty knowledge. Now, I'm not asserting that's enough for known loss. I'm saying any way you parcel known loss, he knew all the elements of a claim were in place, and, in fact, a petition had been filed against him. So it's a more interesting case, you know, if he hadn't known certain things, but he knew every element of every version, and that's why Judge Means correctly applied the fortuity doctrine, as we believe he correctly applied the insuring agreement requirement, which the latents have the burden to establish that the insuring agreement applies. We're not talking about an exclusion here. We do have an exclusion also we talk about, but that wasn't reached by Judge Means. It's in our brief, and we believe that while we bear the burden of showing that the fraud exclusion applies, we met that burden in the proceedings below, although Judge Means did not need to reach that. This Court could affirm if it needed to on any basis, and we believe the fraud exclusion applies because it talks about it doesn't apply to any act of dishonesty or fraud arising out of, and the Texas courts define arising out of, and there was not just any act of dishonesty by white. The jury found multiple acts of dishonesty and fraud. So we believe as an additional argument that the fraud exclusion applies, but we believe Judge Means correctly applied the policy language and held that the latents did not meet their burden of showing that a claim was first made during the policy period due to the prior petition that was filed in spite of the amended petition with a professional negligence cause of action relating to the same facts, and white PC as a new defendant in addition to white himself. So we believe that that is clear. The petition that was filed before inception really led to three consequences for insurance coverage purposes. The two I think we've talked about are the fortuity doctrine and the claim first made, which is part of the insuring agreement. There's a third consequence, which Judge Means did not need to reach, and that is the policy provision 1A.2, which is in our brief, and that says that as a prerequisite to coverage, no insured, and so here we potentially have two insureds, white and white PC, but the provision says no insured had knowledge of any act or omission that might be expected to be the basis of a claim, and that addresses the question of potentially. I believe there was a reference in the prior argument to, well, Judge Means just said a potential claim. Well, if you look at 1A.2, it doesn't require a lawsuit or a claim. It says no insured had knowledge prior to the policy period of any act that might be expected to be the basis of a claim. That's standard claims-made language, and white had knowledge. He was uninsured, and he had knowledge prior to the WESCO period of an act or omission. He had several acts and omissions that might be expected to be the basis of a claim, and in fact they were the basis of a claim, and so that, again, that gets rid of any problems arising out of the white versus white PC because it says no insured is the language, no insured. So that's 1A.2, which is in our brief, and so I won't belabor it, but those are really what we see as the three consequences of the fact that a petition was filed based on acts that had occurred and liability that was going to attach prior to the policy period. In terms of, I had mentioned adding white PC in the amended petition, I think that the only Texas case that the Laytons are able to cite is first professional versus heart, and, again, if you look at that medical practice group case, there were multiple physicians in addition to their practice group. There were multiple claims against various defendants. The practice group was then added, and I think the case is distinguishable on that basis that it is not and I would submit no case has held that a single attorney slash PC situation enables a plaintiff to add the professional corporation and get insurance coverage by doing so. And we really do believe this case was built for exclusion A. Again, I can go to something that Judge Means did not need to reach because it applies to any dishonest or fraudulent act, and we believe there are multiple of those. So the district court declined to change the terms of the WESCO policy or change the Texas fortuity doctrine to accommodate the Laytons, and this court should decline the invitation as well. I think the one instance in which the Laytons asked the district court to change the policy was the language about, and this is another defense to coverage, that no insured, new... What did your policy cover? I'm sorry? I'm just... The Laytons add to the policy requirement that there has to be... They make the argument that the policy has a retroactive date, and therefore it covers everything after the retroactive date and you can't use the known loss doctrine, and that's simply incorrect. We have cases, such as Warrantech, which specifically apply the fortuity doctrine to claims made coverage. Claims made policies almost always have retroactive dates in them. The retroactive date means you can get coverage for a date after the retroactive date as long as everything else in the policy is satisfied, including the knowledge requirements. So you can't have a pre-policy period act that you know about and get coverage. You can have an unknown one, unknown to the insured. So that's the purpose of the retroactive date. It's not surplusage and it's not inconsistent with the fortuity doctrine or with the timing condition. It establishes a cutoff point that anything after that date, which is not known to the insured, can potentially be covered. So we believe that the Layton's argument on the retroactive date is non-meritorious. And I believe we ended up, I think, with five coverage defenses in our brief. Judge Layton had two. Quite frankly, we ran out of pages. We had submitted a few more in the district court, but we didn't have room for them in the appellate brief. So I will rest on my brief for those points. Okay. Thank you, sir. Thank you. Pretty briefly, Your Honor, I want to address one thing the opposing counsel said first, and that is right off the bat, he talked about how the underlying facts for the original petition and the amended petition were the same. That is not true. If you look at the amended petition, the basis for the negligent malpractice, the legal malpractice claim was not that Mr. White had misled them into the transactions, had induced them through theft or fraud or what have you into entering the transactions. The basis for the legal malpractice claim was that when representing them as their lawyer, as we later believed he was, he failed to advise them to secure the transactions, to get deeds of trust for the transactions, to ensure that there was some sort of paperwork done to ensure that if they were not paid back by the LEND doors, by the LENDees, that they had a right of security to reach through and get repaid through another way. And by failing to do that, in fact, in the trial testimony that Wesco put into the record, the whole reason that a legal malpractice expert was brought in to testify was someone to say, yes, as a lawyer in this transaction, Mr. White failed in his duties not because he made misrepresentations but because he failed to advise the LENDees to get security to ensure they'd be paid back. None of that was in the original petition. It was all new to the amended petition. So with respect to the facts and circumstances being the same, with all due respect, they were not. Was counsel correct that the plaintiff elected to take the judgment on the intentional acts? I believe he elected to take the judgment on both, if I'm not mistaken. He wanted to avoid the 30 percent reduction, though, and that would have. Oh, certainly. So that would have eliminated all the negligence claims, right? Except with respect to the punitive damages as well. Part of the reason that there was a total. No, no, I'm talking about not the punitive damages, the other. My point, I understand what you're saying. My point with respect to the punitives is simply that was based also on the gross negligence, and the policy at issue does cover punitive damages. So regardless of whatever the election was at the trial court level, there would still be coverage for the punitive damages portion of the award. Opposing counsel also said a moment ago that Mr. White knew of the theft and the fraud back in August of 2013, and that necessarily also meant that he knew of all the facts that led to the legal malpractice. Again, the facts that are alleged were different. They were not the same. And the fact is, the fact that he may have known of claims of theft or fraud exactly would be the exact opposite of knowing that there was a potential risk under the policy he was purchasing, the reason being theft and fraud were excluded. Claims of theft and fraud were not part of the coverage of the policy. It was only for claims arising from legal services. And again, WESCO testified that there were no legal services alleged in the original petition. That did not come until the amended petition when we talked about the failure to properly advise my client. With respect to Warrantech, I want to go back and talk briefly about this fortuity doctrine issue and the question you were asking about, is it the known acts or the underlying liability? What Warrantech says, it talks about in terms of a known loss. The counsel is correct, but it also talks about how the purpose of the fortuity doctrine is to ensure that what you are insuring against is a known risk. Now, with respect to whether or not there was a known risk because he had been sued for theft and fraud, that's not true with respect to under Warrantech because it was not, with respect to theft and fraud, it was not a risk at all because it wasn't part of the policy. The question was whether or not there was a known risk with respect to legal malpractice. And, again, there is no evidence, other than just what's in the face of the original petition, that there may have been a claim arising from legal services, something that Wesco's representative, again, said is not in the original petition. I want to talk very briefly because counsel brought it up about the fraud exclusion. Counsel, in their brief, cited to Kenetulo Independent School District, and, in fact, I believe, Judge Jones, you were on the panel for that, as well as Commercial Union Insurance Company v. Roberts. Both of those opinions dealt with a fraud exclusion under a policy, and what they ultimately dealt with is the effect of an excluded claim and a claim that is not excluded. And what they ultimately said was that if the evidence that's necessary to prove the excluded claim has to be shown as part of proving the claim that is not excluded, then they're independent, and, therefore, the fraud exclusion would cover it. If they're not, if the evidence of the theft or the fraud, for example, in this case, was not necessary to prove the negligence, which it is not, then our opinion would be they would be independent and, therefore, still cover it. Okay. Thank you, Your Honor. Thank you very much. Appreciate it. Thank you.